## Case No. 6,074.

### HARMANSON v. WILSON et al.

[1 Hughes (1877) 207; 14 Am. Law Reg. (N. S.) 627][1]

Circuit Court, E. D. Virginia.

CONSTITUTIONAL LAW—IMPAIRMENT OF OBLIGATION OF CONTRACTS.

The act of assembly of Virginia, allowing an abatement of interest which accrued during the late civil war, does not contravene the clause of the national constitution which forbids the states from passing laws impairing the obligation of contracts, this state having always and continuously reserved the discretion to juries of allowing or disallowing interest, interest not being a subject of common law right, but of legislative permission.

Bill of foreclosure in equity.

This bill is brought to subject certain real estate of the defendant, [Samuel M.] Wilson, to the payment of two notes held against him by the assignee of the Portsmouth Saving Fund Society, now in bankruptcy, secured by deed of trust. One of the two notes is for the sum of $3450, dated February 4th, 1862, which was given in renewal of other notes which commenced before April, 1861.

---

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission. 14 Am. Law Reg. (N. S.) 627, contains only a partial report.]

The other note, given in like manner for notes beginning before April, 1861, is for the sum of $2990, and is dated on the 29th November, 1870. The defendant, Wilson, makes no opposition to the prayer of the bill, except that he claims that interest be not charged against him for the period of the late Civil War. The fact that the last note was given in 1870 does not conclude the maker of it from claiming an abatement of war interest, a statute of Virginia (Code 1873, p. 982, c. 139, § 7,) allowing such abatement, even after judgments have been rendered, upon motion in the courts rendering them.

The question of the abatement of interest was argued by James E. Heath, Esq., for the complainants, and by the defendant, Mr. Samuel M. Wilson, and Messrs. Baker and Walke for the abatement. Their respective briefs are here given.

Mr. Heath's brief:

The defendant, Wilson, claims that the interest on the debts sued upon for the period commencing April 17th, 1861, and ending April 10th, 1865, shall be remitted. He relies upon an act of the legislature of Virginia, passed session 1872–73. See Acts 1872–73, p. 344, c. 353; Code Va. 1873, p. 1120, c. 173, § 14. The contracts sued upon are negotiable notes, made by the said Wilson, payable sixty days after date, dated February 4th, 1862, and November 29th, 1870, respectively. As to the debt dated 29th of November, 1870, it is alleged the consideration accrued prior to the 10th day of April, 1865. Interest is demandable and recoverable in all cases where there has been either an express or implied contract therefor. The obligation to pay interest, where it is implied from the nature of the contract, is as strong and binding as where the obligation is contained in the contract, and in both cases interest is a necessary incident to the original debt, and a matter of strict right, which must be allowed by the court. A contract to pay interest will be implied either from general mercantile usage or custom, as in the case of bills of exchange and promissory notes, upon which, in the absence of any other agreement, interest runs from the day of maturity and payment; or from the demand, if they be payable on demand; or from the issuing of the writ, where no demand is made; or it will be implied from the particular course of dealings between the parties, or the special custom of one party, known and acceded to by the other. So also where, by the terms of an agreement or contract, the principal is to be paid at a specific time, an agreement is always implied to make good any loss arising from default of payment at the proper time, by the payment of interest after such default. Page v. Newman, 9 Barn. & C. 378; Foster v. Weston, 6 Bing. 709; Calton v. Bragg, 15 East, 223; 1 Hen. & M. 211; Wood v. Hickock, 2 Wend. 501; Robinson v. Bland, 2 Burrows, 1086, 3 Cow. 436.

The foregoing authorities establish the doctrine that interest upon contracts silent as to interest is as much a part of the principal, after maturity or day of payment, or from demand, if they be payable on demand; or from the issuing of the writ, where no demand is made; or from the day upon which, according to the contract, the principal is to be paid, if a day be appointed, as contracts which, upon their face, expressly provide for interest; and, in both cases, where implied and where expressed, interest is a matter of strict right, and must be allowed by the court. Interest, then, being the fruit of the principal, it being a part of the contract, expressly or by implication, does the act of April 2d, 1873, upon which the defendant, Wilson, relies, constitute such a defence as should be respected by the courts? It will be observed that the act of the legislature applies to suits for the recovery of money founded upon contracts, express or implied, or on causes of action, or on liabilities, which were entered into or existed, or where the original consideration accrued prior to the 10th day of April, 1865. The constitution of the state (article 5, § 14) provides that the general assembly shall pass no law impairing obligation of contracts, etc.; and the constitution of United States (article 1, § 10) provides that no state shall pass any law impairing the obligation of contracts, any ex post facto law or bill of attainder. This act of 1872–73 is confined, by its very terms, to a class of cases existing prior to its enactment; in other words, it acts retrospectively entirely. It impairs the obligation of the contract by changing the rights of the contracting parties thereto, authorizing the debtor to pay less by $6 on the $100 for four years than he contracts to pay, and obliging the creditor to receive that much less than he contracted to receive.

In Planters' Bank v. Sharp, 6 How. [47 U. S.] 301, 327, Justice Woodbury says: "One of the tests that a contract has been impaired, is that its value has, by legislation, been diminished. It is not, by the constitution, to be impaired at all. This is not a question of degree, or manner, or cause, but of encroachment in any respect on its obligation, dispensing with any part of its force." Again, the supreme court of the United States says: "Any law which enlarges, abridges, or in any manner changes the intentions of the parties, resulting from the stipulations in the contract, necessarily impairs it. The manner or degree in which this change is effected can in no respect influence its conclusion; for whether the law affect the validity, the construction, the duration, the discharge, or the evidence of the contract, it impairs the obligation, though it may not do so to the same extent in all supposed cases. Any deviation from its terms by postponing or accelerating the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are a part of the contract, however minute and apparently immaterial in their effect, impairs its obligation." Ogden v. Saunders, 12 Wheat. [25 U. S.] 213, 327; Green v. Biddle, 8 Wheat. [21 U. S.] 1, 84. It will not be contended that the contracts to which the statute in question applies, are not diminished in value, nor that the intentions of the parties to said contracts are changed, nor that the validity, construction, and discharge of said contracts are materially affected, nor that there is a plain deviation from the terms of the contract by an imposition of conditions not expressed in the contract, nor that a portion of the conditions of said contracts are dispensed with. The meaning of that provision of the constitution of the United States which forbids a state passing any law impairing the obligation of contracts as construed and defined by a series of decisions of the supreme court, extending from 1810 to 1871, is that the laws existing at the time and place of making the contract, and of the place where the contract is to be performed, are as much a part of the contract as if they were incorporated by express words into the contract. That the state may alter at will whatever belongs merely to the remedy; provided, the alteration does not affect the value of the contract, or in any way impair its obligation. But if the value of the contract is lessened by changing the remedy, then the constitution is violated just as much as if the legislation complained of affected directly the contract itself. McCracken v. Hayward, 2 How. [43 U. S.] 608; Green v. Biddle, 8 Wheat. [21 U. S.] 1; Sturges v. Crowninshield, 4 Wheat. [17 U. S.] 122; Fletcher v. Peck, 6 Cranch [10 U. S.] 87; Von Hoffman v. City of Quincy, 4 Wall. [71 U. S.] 553; White v. Hart, 13 Wall. [80 U. S.] 646. The supreme court of this state have, at all times upon similar questions, been controlled by the decisions of the supreme court of the United States in the foregoing cases, and have but recently reaffirmed them in the cases of Taylor v. Stearns, 18 Grat. 244; Bank of Old Dominion v. McVeigh, 20 Grat. 457; and the Homestead Cases, 22 Grat. 266.

The facts in Taylor v. Stearns were these: G. A. W. Taylor conveyed to James M. Taylor and John Enders, by deed dated 19th of September, 1860, a house and lot in the city of Richmond, to secure the payment of $13,-299.55, due by ten negotiable notes, bearing even dates with said deed, and payable each at six months after the next preceding. In 1866 the trustees advertised the house and lot for sale, and the grantor thereupon applied to the circuit court of Richmond for an injunction to stop the sale, on the ground that the general assembly, at the session of 1865–66, had passed an act providing that there should not be any sales under deeds of trust for the payment of money (except in certain specified cases, of which this was not one), until 1st day of January, 1868. Acts

1865–66, p. 179. The injunction was granted, and at the hearing was dismissed, upon the ground that the act of assembly relied upon by the grantor was contrary to the provision of the constitution of the United States which forbids the passage of a law by a state impairing the obligation of contracts, and upon an appeal to the court of appeals, the decision of the court below was unanimously affirmed. Rives, J., in delivering the opinion of the court in that case, says: "The constitutional prohibition applies to all contracts, whether verbal or written, express or implied, executory or executed; whether between individuals, corporations, states and individuals, or between separate states." 18 Grat. 275. The law of the general assembly, declared to be unconstitutional by the court of appeals in Taylor v. Stearns, was a law which simply postponed the creditor in the collection of his debt. It did not prohibit the collection of any part of the debt, but declared that a certain class of debts should be collected, after notice by the creditor, in instalments of one, two, and three years. If that act, which postponed the creditor in the collection of his debt, defeated the agreement of parties and impaired the obligation of the contracts to which it applied, we respectfully submit, that the act relied upon by the defence in this suit is much more plainly in violation of the constitution, because the intention of the parties is not only defeated, but a portion of the contract is entirely abrogated and annulled. The agreement, as evidenced by the contracts sought to be enforced in this suit, was that the principal was to be paid on the days specified for the payment in the contracts, and if not paid on the days of payment, then the implication was that the principal sum should bear interest, at the rate of six per centum per annum, till paid. The laws of this state, existing when these contracts were entered into, made them valid contracts; no subsequent acts of the legislature can diminish or enlarge the express contract then made to pay the principal, and the implied contract to pay interest if the principal was not paid when due, without 'defeating the intention of the contracting parties and impairing the obligation of the contracts. Chicago v. Sheldon, 9 Wall. [76 U. S.] 50, 55; Bank of Old Dominion v. McVeigh, 20 Grat. 466.

The history of the question of interest is a very interesting one. It seems that, by the ancient common law, no interest was allowed for the use of money; and Hume, in his History of England, at chapter 33, says: "In 1546, a law was, for the first time, passed fixing the interest of money at ten per cent. Formerly all loans of that nature were regarded as usurious. The preamble of this very law treats the interest of money as illegal and criminal." Mr. Jefferson (1 Am. St. Papers, 1st Ed., p. 307) says, that "in England all interest was against law until the statute of 37 Hen. VIII." And his confidence in the correctness of this statement is strengthened by the fact that, up to this time, the Roman Catholic religion prevailed in England, and interest was unlawful in all Roman Catholic countries. The statute referred to of Hen. VIII is not an affirmative, but a negative statute; it provides that "none shall take for the loan of any money or commodity above the rate of ten pounds for one hundred pounds, for one whole year." All statutes passed since, in England and in this country, are of the same character. They are negative, not affirmative; they do not declare in what cases interest shall be taken, much less do they, in any case, require it to be paid. It follows then, necessarily, that interest is a matter of agreement, since all liability must be fixed by law or by agreement, and we have seen that the law does not require interest. If the above position be correct, we must conclude that the allowance of interest by the courts as an incident to the debt, as a fruit of the principal, is founded exclusively upon the agreement of the parties. Calton v. Bragg, supra. This agreement, as we have before said, may be expressed in writing or by words, or it may be implied, and is as binding and as invariably assessed in cases where it arises by implication as where it is in writing or expressed in words.

The agreement, as we have seen, may be implied: (1) From the custom or usage of the business in which the debt is contracted. When such custom is known to the parties, or may reasonably be presumed to have been known, it enters into the original contract, and forms a part of it. (2) When the principal is to be paid at a specific time, the law always implies an agreement to make good the loss arising from a default, by the payment of interest. Per Lord Mansfield, in Robinson v. Bland, 2 Burrows, 1086. It is a maxim universally acknowledged and acted upon, that, where interest does not run with the principal, none accrues until default is made in payment. "All contracts to pay undoubtedly give a right to interest from the time the principal ought to be paid." Lord Thurlow, in 2 Brown, Ch. 3; Calton v. Bragg, before cited. (3) Where an account has been liquidated by both parties, and the debt therefore becomes due and payable, it carries interest on the same ground of a debt payable at a specific time: there is an implied contract to pay. Boddam v. Riley, 2 Brown, Ch. 3; 1 P. Wms. 376; 7 Johns. 213; 3 Wils. 205; 15 Johns. 424. (4) Where an account has been rendered, and the debtor, during a reasonable time for that purpose, makes no objection, it may be presumed that he has acquiesced in its correctness, and it then becomes a liquidated account, and carries interest from the time of such presumption. 2 Ves. Sr. 239.

In the foregoing enumerated class of cases, and others of a kindred nature, interest is considered and treated by the courts as a

necessary incident to the principal, and allowed as a matter of right. But there is another class of cases where interest is not a matter of right, where it is not an incident of the principal, and where properly and necessarily it is left to a jury, in its discretion, to be allowed or not; and when this discretion is fairly exercised, the courts will not interfere with the verdict. It is to this class of cases that our statute (Code Va. 1873, p. 1120, c. 173, § 14, to which the act of 1872–73—relied upon by the defendant, Wilson—is an amendment, and which has been the law of this state since the Code of 1819) is intended to apply, and does apply. The class of cases of which we are now treating, and which, we insist, are included and controlled by our statute, differ widely, and must be distinguished from those cases where interest is allowed by the courts as an incident of the principal, and as a matter of strict right. The confusion and difficulty which seem to exist upon the question of interest grow out of the mingling of these classes. They are entirely independent of each other, and the principles which govern and control them bear no analogy to each other.

Interest is a question in the discretion of the jury, and is allowed by way of damages or punishment, where the debtor has been guilty of fraud or injustice, or some injury has been done; and in such cases the legal rate of interest is assumed as the rule or measure of damages. Thus, in actions of tort, technically so called—as in trover, detinue, or in trespass—interest may be allowed by way of damages, by the jury (14 Johns. 128, 385; 13 Grat. 219, 454, 461; 11 Leigh, 219); in actions ex contractu, as in covenant for breach of covenant; in assumpsit to recover money improperly retained and withheld from the rightful owner, as in the case of an attorney collecting the money of his client and failing to pay it over, or a sheriff collecting money on an execution and misappropriating the money thus collected, and on penal bonds. So in cases where an agent makes advances to his principal, or the principal to his agent, and in cases of fiduciaries receiving money and making no disposition of the same for an unreasonably long time, or innocently misapplying the funds in hand, —in all these cases, and those of a like character, the question of interest is left to the discretion of a jury under the advice of the court, and that discretion, properly exercised, will not be disturbed by the court. Our statute before referred to applies to such cases as we have enumerated, and not to cases where interest is a part of the debt by expression or by implication. The rule by which the two classes of cases are to be distinguished is thus stated in Rensselaer Glass Factory v. Reid, 5 Cow. 616: "Where money has been lent, advanced, or expended by request, and under an agreement to pay at a specific time, or when it has been had and received under a like agreement, then the allowance of interest may be safely referred to the principle of an implied contract to pay interest on default; and so, also, where the money is not to be refunded at a particular time, but a default arises from a demand, or notice, the same principle will apply. But where no time of payment is fixed, and where the duty to pay arises from the relative situation of the parties, it seems it should be referred to a jury to determine whether damages shall be given by an allowance of interest."

The facts of this case show conclusively that it is not one of that class in which a jury could allow interest in its discretion, because: (1) The contracts are payable at a specific time and place. (2) The notes evidencing the indebtedness are negotiable: the maker, at the time of their execution, a citizen of Virginia, residing at Portsmouth; the contract made in Portsmouth, and payable in Portsmouth; and according to the custom and usage of the bank holding these notes, and the custom and usage of such transactions in Virginia (which custom and usage was known, or presumed to be known, to the maker), interest accrued and was payable from the day upon which the notes fell due. (3) Wilson has already made a payment upon each of said notes, to be applied (and which has been applied) to the extinguishment in part of the interest. (4) The deeds of trust executed by Wilson to secure these debts, or his indorsers for these debts, and which under the law enures to the benefit of the holder of the notes, provide for the securing of the principal and interest.

The cases cited by Mr. Wilson in his note have no application to the case at bar. McCall v. Turner, 1 Call, 115, was an action upon a bond for penalty; and all the judges who delivered opinions in that case use the following language: "The act of assembly has altered the common law; and by allowing the penalty to be discharged by the payment of the principal and interest due thereon, necessarily turns the quantum into a question to be determined by circumstances; and it is the province of the jury to decide that question." The plaintiff, McCall, purposely absented himself from the country, and remained absent during the Revolutionary War, and left no authorized agent to act for him. He put it out of the debtor's power to pay the interest. It will be observed, in the first place, that the instrument sued upon, the character of the contract, in McCall v. Turner, is of that class in which, by the act of assembly, interest is left discretionary with the jury; and in the second place, the plaintiff, by his own voluntary act, had placed himself, not only beyond the reach of the defendant or debtor, but was a citizen of the British government, between which and the debtor's government war existed for about eight years, the result of which was the establishment of an independent government for the country of the debtor.

In the case at bar, as we have before shown, the debts sued upon are of that class in which interest is a strict matter of right after maturity; and the holder of these debts, the Portsmouth Saving Fund Society, a body corporate under the laws of Virginia, doing a banking business in the city of Portsmouth, never changing its place of business, much less placing itself beyond the reach of its debtors. If the debtor voluntarily places himself where he cannot communicate with his creditor, and by consequence renders himself unable to pay his interest, surely the law, which would exempt from the payment of interest where the creditor absents himself from the country and places it beyond the power of the debtor to pay, will compel the debtor to pay where the default has happened by the act of the debtor himself. Brewer v. Hastie, 3 Call, 21, was a suit in chancery brought to settle up a long running account between the parties, in which there were mutual credits and debits, and no balance struck (a case eminently proper for the exercise by the court of a discretion in fixing the time from which interest shall run); and when the debtor sought his creditor to pay his debt, he found he had left the country. The court, upon the authority of McCall v. Turner, decided interest should be abated during the war. The creditors, Hastie & Co., were British subjects. Ambler's Ex'rs v. Macon, 4 Call, 605, does not bear upon the question at issue here. The expression used by the court in this case, that "interest, during the war, ought not, in justice and equity, to have been allowed," etc., was not necessary in establishing the principles governing the case under consideration, not acted upon in the decision of the case, and cannot therefore be relied upon as settling or establishing any principle.

The citations from the letter of Mr. Jefferson to Mr. Hammond (1 Am. St. Papers, pp. 307-312), are interesting and improving, but are not law for this court. The views therein presented were in answer to the charge that the government of the United States had not kept the treaty of peace, inasmuch as our courts had refused to allow interest to run on debts due British subjects during the war. Some of the views expressed in this letter upon the subject of interest are sound, and some in conflict with a long series of decisions of the supreme court of the United States since made and hereinbefore referred to. Mr. Jefferson says that "interest is no part of the debt; that an assignment of the debt does not necessarily carry interest upon the debt; and that interest depends altogether on the discretion of the judges and jurors." Page 307. We have seen that in many cases interest is a part of the debt, following the debt, and recoverable as a matter of strict right.

The cases relied upon by the defendant, Wilson, establish that interest accrued during the Revolutionary War upon debts due by the citizens of this country to those of the British government, where the creditor placed it out of the debtor's power to pay interest, ought properly to be abated. Chief Justice Chase, in Shortridge v. Macon [Case No. 12,812], decided in the circuit court of the United States for North Carolina, in 1867, allowed interest during the late war upon a debt due citizens of Pennsylvania by a citizen of North Carolina. He uses the following language: "It is claimed, however, that whatever may be the right of the plaintiffs to recover the principal debt from the defendant, they cannot recover interest for the time during which war prevented all communication between the states in which they respectively reside. We cannot think so. Interest is the lawful fruit of principal. There are, indeed, some authorities to the point, that interest which has accrued during war between independent nations cannot be afterwards recovered, though the debt, with other interest, may be; but that rule, in our judgment, is applicable only to such wars." We are told by the defendant, Wilson, in his answer, that the notes held by the plaintiff, and sought to be enforced in this suit, are renewals of notes executed prior to the 17th day of April, 1861. We are also informed by him that the Confederate forces evacuated Portsmouth about the middle of May, 1862, and that he remained within the Confederate lines from that time until the termination of the war. The record shows, then, at the date of the maturity of said debts, when they were payable, and for some time thereafter, the maker was in Portsmouth, where the holder was doing business, and nothing prevented the payment of the debts.

The supreme court in Ward v. Smith, 7 Wall. [74 U. S.] 447, held as follows: (1) The designation of a bank as a place of payment of a bond, imports a stipulation that its holder will have it at the bank when due, to receive payment, and that the obligor will produce there the funds to pay it. (2) If the obligor is at the bank at the maturity of the bond, with the necessary funds to pay it, he so far satisfies the contract that he cannot be made responsible for any future damages, either as cost of suit or interest for delay. (The opposite of the proposition last stated must be true, and the party, under such circumstances, seeking a rebate of the interest, should show, that on the day of maturity, he was ready, and at the place named, to discharge the debt.) The court further held, in Ward v. Smith, supra: If the rule that interest is not recoverable on debts between alien enemies, during war of their respective countries, is applicable to debts between citizens of states in rebellion, and citizens of states adhering to the national government in the late Civil War, it can only apply when the money is to be paid to the belligerent directly; it cannot apply where there is a known agent appointed to receive the money, resident within the same

jurisdiction of the debtor. In the latter case, the debt will draw interest. Mr. Wilson, in his answer, says, that the amount due on the 17th of April, 1861, on the note of indorser, Arthur Emmerson, was $3400, and this amount remained due as principal until the 10th day of April, 1865. On the 17th day of August, 1865, he paid to the Portsmouth Saving Fund Society, the sum of $892.76, and on the 15th of November, 1867, he paid the further sum of $554.24. These payments were made in gross, but credited to the note indorsed by Arthur Emmerson, as shown by statement filed and marked "Exhibit A." He claims a rebatement of the interest on the original debt of $3400, indorsed by Emmerson, from the 17th of April, 1861, to 10th of April, 1865. The position taken by Mr. Wilson with reference to the abatement of interest on this debt is wholly untenable. Statement "A," filed with his answer, shows, and he himself says, that the payments which he made in 1865 and 1867, were applied by the cashier, Mr. Bain, with his consent, to the extinguishment of the interest first, and then of the principal of the debt indorsed by Arthur Emmerson. The interest on this debt ceases to be a question, the rights of the parties relating to the interest have been adjusted—it has been paid. The parties who settled it were competent to settle it; they had a right to settle it; they have settled it; rights have become vested by the settlement; property acquired by the bankrupt, or its creditors in the interest, and the contracts thus made, rights thus acquired, cannot be annulled, violated, divested. These payments cannot be disturbed. If a creditor holds two claims against his debtor, and the debtor makes a payment, and directs to which debt the payment shall be applied, it must be so applied, and the law will not permit any change in the application; so, if the debtor fails to make the application, and the creditor exercises his right to apply the payment in the absence of instruction from the debtor, the application once made is final, irrevocable; or, if both creditor and debtor fail to make the application of the payment, the law makes it, and both parties are bound by the direction of the law. Hill v. Southerland's Ex'r, 1 Wash. [Va.] 133; [Mayor, etc., of Alexander v. Patten] 4 Cranch [8 U. S.] 320; U. S. v. Kirkpatrick, 9 Wheat. [22 U. S. 720]. In the case at bar, the payment was made to the extinguishment of that portion of the debt which the law requires shall be first satisfied, to wit, the interest. It is a much stronger case than could arise under the doctrine of the application of payments for the non-interposition with rights of parties once settled and adjusted.

S. M. Wilson, for defendant.

Interest is no part of a debt, unless made so by special contract to pay interest; and the allowance of interest, both in England and the United States, has, as a general rule, been left discretionary with the courts. This is shown by the whole current of legislation on the subject in Virginia, from the earliest periods in the history of the commonwealth down to the present time. In the year 1730, interest was fixed at six per centum per annum. 4 Hen. St. at Large, p. 294. In the year 1734, it was reduced to five per cent., and this, by successive legislation, was continued the rate until the 1st of May, 1797, when the rate was restored to six per cent. In the Code of 1819 (1 Rev. Code, p. 508) we find it enacted that "in all actions founded on contracts, when judgment shall be rendered in court, if interest be allowed, such interest shall be upon the principal sum due, and shall continue until such principal sum be paid; and on all actions founded on contracts, and tried before a jury, the jury shall ascertain the principal sum due, and fix the period at which interest shall commence, if interest be allowed by them, and judgment shall be rendered as carrying on interest till the judgment shall be satisfied." In the Code of 1849 (page 673) it is enacted that "the jury, in any action founded on contract, may allow interest on the principal sum due, or any part thereof, and fix the period at which such interest shall commence. And in any action for a cause arising hereafter, whether from contract or from tort, the jury may allow interest on the sum found by the verdict, or any part thereof, and fix the period at which said interest shall commence. If a verdict be rendered hereafter which does not allow interest, the sum thereby found shall bear interest from its date, whether the cause of action arose heretofore, or shall arise hereafter, and judgment shall be entered accordingly." This same section was re-enacted in the Code of 1860 (page 732), and again re-enacted in the Code of 1873 (page 1120), with a proviso "that in all suits for the recovery of money, founded on contracts, express or implied, or on causes of action or liabilities, which were entered into or existed, or where the original consideration accrued prior to the 10th day of April, 1865, it shall be lawful for the court or jury, by whom the suit may be tried, to remit the interest upon the original debt found to be due, or any part thereof, for the period commencing on the 17th day of April, 1861, and ending on the 10th day of April, 1865, or for any portion of said period." These acts are cited to show how fully and continuously the question of interest has been kept in the control of the legislature, and submitted by it to the discretion of the courts, in which it rested at common law, and how clearly and continuously it has recognized interest as no part of a debt, by leaving the allowance of it to the discretion of courts and juries. As to the disallowance or remission of interest during the late war, authorized to be made by the courts or juries by the Code of 1873, as quoted above, the act is but an affirmance of the law as recognized

and declared by the court of appeals, the highest judicial tribunal we have in Virginia, in cases carried before it subsequent to the War of the Revolution. In the case of McCall v. Turner, 1 Call, 115. This was a case in which the jury of the district court of King and Queen county found a verdict for the principal of the debt claimed, and interest thereon from the date of the bond to the 19th day of April, 1775, and from the 19th day of April, 1783, till paid, thus remitting interest during the period of the War of the Revolution. From the judgment of this verdict an appeal was taken, and the judgment was affirmed without dissent from either of the judges of the court of appeals. In this case the creditor, during the war, from some time in the year 1775 to some time in the year 1783, was out of Virginia in parts beyond sea. Each of the judges, in delivering his opinion in the case, recognized the question of interest due as one to be decided by the jury, who, according to the language used by Judge Carrington, should say "when it should commence, how long it should continue, and when it should be suspended or extinguished." President Pendleton, in delivering his opinion in the case, says: "The only question, therefore, is whether interest during the war constitutes a bona fide part of the debt. And I do not hesitate to declare my opinion in the negative, whatever stigma may be attached to that opinion. Our situation at that period, attacked by a powerful nation, to whose government we had been subject, called for the exertion of every power, personal and pecuniary, in defence of life, liberty, and property; and without commerce (which had heretofore been monopolized by that nation) to enable our citizens to pay their debts, takes the case out of every principle on which interest is demandable. The objection applies to all creditors, but a fortiori against those of the nation who unjustly brought us into that situation." This case was decided in the year 1797 by the court of appeals. In the year 1801 the case of Brewer v. Hastie, 3 Call, 21, was decided by the court of appeals in accordance with the decision in the case of McCall v. Turner, war interest for the eight years of the Revolution being disallowed by the court. The claimant of debt and interest in this case was a British subject, and non-resident of the commonwealth. Following these cases comes the case of Ambler's Ex'rs v. Macon, 4 Call, 605. The court of appeals stated, in its decree in this case, that "interest during the war ought not, in justice or equity, to have been allowed on debts due to domestic creditors, no more than to foreign; but since it has not been attended to, either in practice or judicial decisions, until so much business has been otherwise adjusted, it would be unjust at this late era to introduce it in a particular case, unless in one attended with peculiar circumstances." This last-named case was decided in the year 1803, twenty years subsequent to the close of the War of the Revolution.

In the three cases above cited no one of the judges of the court of appeals expressed dissent to the rulings of the court, and the decrees never having been reversed or overruled, stand among the judicial decisions as exponents of the law on the subject embraced by them, and fully sustain the principle that the question of allowing interest during war is at the discretion of the courts and juries. As said above, the act of 1873, giving legislative sanction to the disallowance of interest during the late war, is but an affirmance of the doctrine recognized and declared by the court of appeals, and only shows that the power to disallow interest during the war exists in the courts and juries, and was, no doubt, passed to indicate that the exercise of the power is required for the general good, and called for by right and justice. From the language of the decree in the case of Ambler's Ex'rs v. Macon, 4 Call, 605, it may be inferred that the question of interest running during the war was overlooked, in the majority of cases, immediately succeeding the War of the Revolution; but this can be readily understood if we consider how few persons, comparatively, know the laws, though all are presumed to understand them. That the debts of private individuals then must have been slight, both in number and amount, compared with the mass of liabilities now resting on our people; and that the people then having come through the War of the Revolution with their labor and social organization unchanged, and their property nearly intact, and with lands yielding generous returns to tillage, their power of recuperation must have been such as to leave but little necessity for any relief, save such as the creditor, in most cases, could easily extend to the debtor. The case is different now, when our people having recently passed through a war of almost unparalleled magnitude, during which a very large portion of the state has been laid waste and devastated, from which it is but beginning to recover, have yet the great bulk of their antebellum indebtedness to meet, while their whole system of labor has been swept away, and requires to be organized again, and farming, their main occupation, can barely be relied on for subsistence, and often fails in affording it. The rate of interest is fixed by statute law, and particular cases are defined in which it may be allowed; but the law does not declare or make interest a part of a debt; and while laws are enacted for the construction and enforcement of contracts, they form no part of them (unless possibly of implied contracts), and this, though contracts when made are only valid and binding so far as they are in conformity with law, and, as a general rule, are made and to be construed under the laws and usages existing at the

place and time they are entered into. There are probably, now, no contracts for the payment of money existing in Virginia which have not been made since the allowance of interest on contracts in · suits brought on them has been submitted by express law to the discretion of the courts or juries. If I be correct, no party to any contract can complain of the provision of the Code of 1873, quoted above.

As to interest being no part of a debt at common law, I refer to Vin. Abr. tit. "Interest," (c), § 7, and to Chit. Cont. tit. "Interest," and cases cited there; and on · this subject, and also as to interest not running during wars, involving general and national calamity, I ask to present the following extracts, made from a communication made by Mr. Jefferson, when secretary of state of the United States, to Mr Hammond, minister plenipotentiary from Great Britain to the United States, under date of the 29th May, 1792, and published in volume 1, American State Papers, and to call attention to those portions of said communication from page 304 to 317, as containing the fullest exposition I have been able to find, both as regards interest forming no part of a debt at common law, and its not running during war, or other national calamity cutting off income, the source properly from which interest is payable. "Section 54, the treaty, is the text of the law in the present case, and its words are, that there shall be no lawful impediment to the recovery of bona fide debts. Nothing is said of interest on those debts; and the sole question is, whether, where a debt is given, interest thereon flows from the general principles of the laws. Interest is not a part of the debt but something added to the debt, by way of damage, for the detention of it. This is the definition of the English lawyers themselves, who say, 'Interest is recovered by way of damages, ratione detentionis debiti.' 2 Salk. 622, 623. Formerly all interest was considered as unlawful in every country in Europe; it is still so in Roman Catholic countries, and in countries little commercial. . . . . In England, also, all interest was against law, till the statute of 37 Hen. VIII. c. 9. The growing spirit of commerce, no longer restrained by the principles of the Roman Church, then first began to tolerate it. The same causes produced the same effect in Holland, and perhaps some other commercial and Catholic countries. But, even in England, the allowance of interest is not given by express law, but rests on the discretion of judges and juries as the arbiters of damages. And we may add, once for all, that there is no instrument or title to debt so formal and sacred as to give a right to interest on it under all possible circumstances. The words of Lord Mansfield (Doug. 753), where he says, 'That the question was, what was to be the rule for assessing the damages, and that in this case, the interest ought to be the measure of the damage, the action being for a debt; but in a case of another sort the rule might be different;' his words (Doug. 376), 'that interest might be payable in cases of delay, if a jury, in their discretion, shall think fit to allow it;' and the doctrine in Giles v. Hart, 2 Salk. 622, that damages or interest are but accessory to the debt, which may be barred by circumstances which do not touch the debt itself,—suffice to prove that interest is not part of the debt, neither comprehended in the thing nor in the term; that words which pass the debt do not give interest necessarily; that the interest depends altogether on the discretion of the judges and juries, who will govern themselves by all existing circumstances, will take the legal interest for the measure of their damages, or more or less, as they think right, will give it from the date of the contract, or from a year after, or deny it altogether, accordingly as the fault or the sufferings of one or the other party shall dictate. Our laws are generally an adoption of yours, and I do not know that any of the states have changed them in this particular. But there is one rule of your and our law, which, while it proves that every title of debt is liable to a disallowance of interest, under special circumstances, is so applicable to our case that I shall cite it as a text, and apply it to the circumstances of our case. It is laid down in Vin. Abr. 'Interest' (c) § 7, and Abr. Eq. 5293, and elsewhere, in these words, 'Where, by a general and national calamity nothing is made out of lands which are assigned for payment of interest, it ought not to run on during the time of such calamity.' This is exactly the case in question. Can a more general national calamity be conceived, than that universal devastation which took place in many of these states during the war? · Was it ever more exactly the case anywhere, that nothing was made out of the lands which were to pay the interest?" .

In the history of the world, there probably has been no instance among civilized nations of a general or national calamity in which the people have been so deprived of available income while it was pending, or at its close left so little able to meet their engagements, especially the payment of interest which accrued while it lasted, as the people of Virginia have during and since the recent war. During the war they were barely able to secure subsistence for themselves and families, in many cases losing their entire property by the exigencies of the war, and called on by the state authority to contribute their time, means, exertions, and, in many cases, their lives, to the defence of the state. Since the war, through the abolition of slavery, a very large proportion of what constituted their productive property has been swept away; and resuming the cultivation of their lands, which had been ravaged and desolated by the war, without any organized system of labor, and without adequate circulating medium (now needed more than ever), which

they have not the means to purchase, and are prohibited from creating, as they did before the war, their financial condition has been and continues worse than at any other period in our history. If there ever existed cases in which interest accrued during war or national calamity should be disallowed, the cases which it was the object of the statute of 1873, above quoted, to reach, stand pre-eminent among them; and the facts adverted to above, and giving birth to the statute, appeal trumpet-tongued to the courts and juries, to whose discretion the question of allowing interest during the war is submitted, not to allow it.

Messrs. Baker & Walke united in the argument of Mr. Wilson, and cited the following additional authorities: Code Va. p. 1120, § 14; decisions United States courts, declaring state laws unconstitutional: Gilchrist v. Little Rock [Case No. 5,421]; [Jackson v. Lamphire] 3 Pet. [28 U. S.] 280; [Watson v. Mercer] 8 Pet. [33 U. S.] 88; [Green v. Biddle] 8 Wheat. [21 U. S.] 90–92; [Fletcher v. Peck] 6 Cranch [10 U. S.] 128; Dartmouth College v. Woodward. 4 Wheat. [17 U. S.] 625; and case of Tucker v. Watson, 6 Am. Law Reg. 220. decided by district court of appeals at Petersburg, Judge Joynes.

HUGHES, District Judge. The exhaustive arguments of counsel in this case relieve me of the task of collating the authorities, or presenting any extended reasoning, upon the questions at issue. I think that upon authority, as presented in the Virginia cases of McCall v. Turner. 1 Call. 115; Brewer v. Hastie, 3 Call, 21; Ambler's Ex'rs v. Macon, 4 Call, 605; Tucker v. Watson, 6 Am. Law Reg. 220; and the series of acts of assembly by which this state has expressly and continuously, from the beginning, preserved to her juries a discretionary power over the subject of interest on money,—we may assume the law of this commonwealth, as between citizens thereof, to be. that interest during a period of war may be disallowed by a jury or a court without breach of contract. The legislature of Virginia, by a long series of acts, reaching down, in conjunction with acts of parliament, from the time when, by express statute. the taking of interest on money at such rate as the statute expressly named was declared not to be usury, and was converted from a crime into a statutory privilege,—has reserved to itself the power to say first, through a jury, under what circumstances interest may be taken at all; and next. what percentage of interest shall be allowed. These statutes. and the decisions of her highest courts and ablest judges in the cases I have named. seem to me to settle the law of the subject for this commonwealth. The law may not be precisely the same in other states of the Union. or in England. The weight of authority elsewhere is probably in favor of

the exaction of war interest; and the decisions of the supreme court of the United States in cases between other litigants than citizens of Virginia probably incline in the same direction; but a federal court adjudicating between citizens of a state of the Union in cases where the lex loci contractus governs, is bound to follow the law of that state as interpreted by its courts of highest resort; and therefore I feel bound in this case to disregard contrary decisions on this subject which may have been made by the courts of other states, or by the federal courts in adjudicating between citizens of other states, and uphold the Virginia statute (section 14, c. 173, Code 1873).[1] If I were to deny the power of the court or of a jury to disallow war interest in Virginia, I should have not only to nullify an act of assembly which all courts of the state are now administering, but to disregard solemn decisions of its supreme court of appeals, never overruled, and rendered at a time when that court commanded. probably more than at any other, the highest consideration among lawyers and jurists. See Fowler v. Dillon [Case No. 5,000]. The only ground upon which opposition is or can be made to this provision of the Code leaving it in the discretion of court and jury to allow or not interest during the period of the late war is that it impairs the obligation of contracts, and thus violates that clause of the national constitution which prohibits the states from passing laws having such effect.

It is contended, however, in reply, that interest is not in all cases an obligation of contract, in the meaning of the clause of the national constitution referred to. It is true that it is sometimes expressly provided for in the bond, promissory note, or other writing in which parties unite. In such cases, of course, the payment of it is an obligation of contract; and but for the fact that the taking of interest at all is wholly of legislative permission, and that that provision has been in Virginia continually coupled with a legislative reservation to juries of discretion over it. there could be no denial of the fact that the obligation was protected by the provision of the national constitution which has been named.

But in the large majority of cases interest is not payable by express contract. In a multitude of them the obligation to pay it is only implied. Where it is not given by express contract, and the obligation to pay it is not implied by the courts, there is a large class of cases in which it is given as damages for the non-payment of money when due. There are, therefore (using the terms of the civil law,) three modes in which interest may become due: by obligation ex contractu, by obligation quasi ex contractu, and

---

[1] A decision of Judge Giles, of the United States court. district of Maryland. disallowing war interest. is given elsewhere. [See Jackson Ins. Co. v. Stewart, Case No. 7,152.]

by obligation ex delicto; that is to say, by contract, by implied contract, and by tort. It is with reason contended that the prohibition of the national constitution does not apply to the two latter classes of contract, but only to the first. There is reason for prohibiting the states from impairing express contracts entered into in solemn form; while great mischief and abuse may result from wholly annihilating their power over the multitudinous class of implied contracts, which are inferences of the courts often contravening the intention of parties. The clause of that instrument containing the prohibition is in these words: "No state shall . . . pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts." Each of the other phrases in the context is used in its strictly technical sense. "Bill of attainder" has a well-defined judicial meaning, and the courts will not give it a constructive meaning other than or beyond its technical one. So the phrase "ex post facto law" is held to embrace only laws relating to crimes, and will not be allowed by the courts to embrace retrospective laws affecting civil rights. Likewise, it is contended that the phrase "obligation of contracts" should be strictly construed; that is to say, should be treated technically, and should not be interpreted to embrace other contracts than those known in the classification of the civil law as "obligationes ex contractu," or "express contracts." It is a historical fact that the prohibition was inserted in the constitution on the motion of an eminent civil lawyer, educated in Scotland, Mr. Wilson, afterwards justice of the supreme court of the United States. There can be no doubt that the mover of the provision intended it to have only its technical signification; and it is with reason contended that the phrase should be construed strictly, and not be latitudinously extended to apply to obligationes quasi ex contractu (implied contracts), or to obligationes ex delicto, the obligation to pay damages. What possible reason can exist for depriving the states of power over the latter classes of obligations?

Neither of the notes which are the subject of the petition in this case gives interest in terms. It is due upon each of them only by implication. It is due for the forbearance of money. It is due by obligation quasi ex contractu. It may with reason be contended therefore, that this is not one of the class of contracts falling within that prohibition of the national constitution which would render the act of the Virginia assembly void in regard to express contracts. But however this phrase of the national constitution may be interpreted touching the special subject of interest in other states, and in suits between citizens of other states, the question in Virginia stands upon a special basis, to some extent peculiar to this commonwealth. Here the state of the law relating to interest is as follows: By common law, the taking of in-

terest was usury, and a punishable offence. This being the normal condition of the law for a long time, a statute finally was passed in England giving the creditor permission to charge a certain limited percentage of interest, the taking of a greater percentage being still left as a punishable offence; and in Virginia this statutory permission has been continued from time to time down to the present day, always coupled with a legislative provision that the allowance of even the rate of interest permitted to be taken by law should be within the discretion of juries. Therefore this legislative provision has entered into and become a part of every contract of interest, express or implied, which has been made, during its existence upon the statute-book. Being a part of the contract in every case, the clause of the national constitution prohibiting the passage of laws impairing the obligation of contracts does not apply to this law of Virginia. The condition of the law in Virginia, on this subject, is precisely the same as it is on the subject of corporate charters. When the legislature grants a charter, but for a general law on the subject it would have no power to alter or amend the charter until the term for which it had been granted had expired. This is so, because of the decision of the supreme court in the Dartmouth College Case, which declared charters to be contracts, and that laws altering charters had the effect of impairing the obligation of contracts, and therefore contravened the clause of the national constitution forbidding such laws. The consequence has been, that most or all of the states—Virginia among them—have expressly reserved the right to alter or amend every charter that is granted. In Virginia this reservation is not repeated in each act of charter, but is a standing provision in the form of a general law of corporation, so that now, by virtue of that general law, the legislature of the state alters and amends every charter at its pleasure, and these amendatory laws do not contravene the clause of the national constitution under consideration. Precisely the same is the case with reference to the disallowance of interest. From a period long anterior to the adoption of the national constitution, has the general assembly of this state reserved to itself the power of intrusting the allowance of interest to the discretion of juries. This express reservation of power has entered into every contract between her citizens that has been made within a hundred years, and the act of assembly of 1872–73, c. 353, p. 344 (Code 1873, § 14, c. 173, p. 1120), directing the courts and juries to exercise that discretion, does not, in my opinion, in any degree, impair the obligation of contracts within the inhibition of the national constitution.

As to the equities of the case, alluded to by both counsel in the conclusion of their briefs, I think there are, in general, very strong equities against the allowance of war interest. In the great majority of cases in which the

interest for that period is unpaid, the creditors refused to accept it, at the time it fell due, in the currency then in circulation. They preferred to take the chances of receiving gold or its equivalent, after the war should be over, and of the enactment of such legislation as the state has actually resorted to. The permanent and fixed legislative policy of the state had been and was, to reserve to her juries the discretion of allowing or disallowing all interest; and these creditors certainly ought to have contemplated the very probable contingency of the legislature's directing the exercise of this discretion as to interest falling due during the war, when all the resources of the state and her citizens were devoted to the prosecution of their side of the contest. They had knowledge of the legislative policy alluded to, and had notice of the probability that war interest would be disallowed as described. If, with such notice, they chose to refuse interest, as it became due, or to forbear the collection of it, they cannot now complain of the harshness of the law by which it is disallowed. The assignee in bankruptcy has made his claim to war interest in this case by bill in chancery, making the maker of the notes, the trustee in the deeds of trust securing their payment, and the indorsers of the notes on which the interest is claimed, parties defendant. A decree will be given in accordance with the prayer of the bill, except that the defendant, Wilson, will be required to pay the amount which shall be found due upon the notes, without computing interest for the period between the 17th of April, 1861, and the 10th of April, 1865.